[Civ. No. 10759. Third Dist. July 8, 1964.]

HAZEL JEANNE BOYD, Plaintiff and Appellant, v. JOHN H. BOYD, Defendant and Respondent.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein and Reginald M. Watt for Plaintiff and Appellant.

Alan H. Thieler for Defendant and Respondent.

FRIEDMAN, J.—According to her complaint, plaintiff's first husband died in 1956. Following his demise she commenced receiving monthly payments of $75 from the Veter-

ans Administration and $78.80 as a social security allowance. Plaintiff became engaged to defendant in February 1959 and married him on December 17, 1961. After two days defendant left her and has since refused to live with her and to support her. As a result of the marriage the Veterans Administration and the social security authorities terminated her monthly payments. Her amended complaint, in three counts, seeks an award of damage. The core of Count I consists of allegations that defendant breached an express oral promise to live with and support plaintiff. Count II is based on the allegation that, with full knowledge of her government payments, he fraudulently made promises to live with and support her without any intention of fulfilling these promises. Count III alleges that he negligently married her or negligently left her without reasonable care as to her support.

The lower court sustained a general demurrer to this complaint and plaintiff failed to amend. Judgment was entered for defendant and plaintiff appeals. The allegations of the complaint are deemed admitted for the purpose of this appeal. The problem on appeal is whether these claims are barred by Civil Code sections 43.4 and 43.5, abolishing so-called ''heart balm'' actions.[1]

Section 43.5, the original statute outlawing this group of actions, was enacted in 1939. Subdivision (d) aimed at so-called breach of promise suits, but its scope was sharply confined in 1956 when the Supreme Court held that it barred only causes of action for breach of contract, not actions resting upon allegations of a fraudulent promise of marriage. (*Langley* v. *Schumacker*, 46 Cal.2d 601 [297 P.2d 977]; see Note 8 Hastings L.J. 210.) In response, the 1959 Legislature adopted section 43.4, barring actions based upon fraudulent promises.

Most of the reported decisions collected in annotations to sections 43.4 and 43.5 involve head-on attempts by plaintiffs' attorneys to crush rather than avoid the statutes. In *Langley* v. *Schumacker*, however, counsel succeeded after several

---

[1]Civil Code section 43.4 provides: ''A fraudulent promise to marry or to cohabit after marriage does not give rise to a cause of action for damages.''

Civil Code section 43.5 provides: ''No cause of action arises for:

''(a) Alienation of affection.

''(b) Criminal conversation.

''(c) Seduction of a person over the age of legal consent.

''(d) Breach of promise of marriage.''

amendments in drawing a complaint which was found to be outside the scope of section 43.5. Count I of the present complaint sounds in contract rather than tort. It is undoubtedly framed on the theory that section 43.5, subdivision (d), bars only actions for breach of contract "to marry," not affecting suits where the marriage has taken place and not affecting damage claims for breach of a collateral promise, such as the promise to provide support. Thus we are called upon to decide whether subdivision (d) of section 43.5 abolishes actions for breach of marriage promise: (a) where the defendant jilted the plaintiff after instead of before the marriage ceremony; (b) where an express oral promise of support was made and violated; (c) where plaintiff surrendered or lost valuable income in reliance upon the violated promise.

Does the marriage ceremony take the case out of the class of suits prohibited by section 43.5, subdivision (d)? In this statute the Legislature expresses a policy against actions for "breach of promise of marriage." Arguably, the quoted phrase refers to the classic case of the broken engagement, the anticipatory repudiation of a promise to marry. Alternatively, it may embrace any class of damage suit originating from the breach of marital vows made before or as part of the marriage contract. In our view the occurrence of a marriage ceremony does not affect operation of the statute. A breach of promise is a failure to do what one promises to do. Whether the defendant makes a promise "of marriage" or "to marry," he contracts not only to undergo a marriage ritual but also to fulfill matrimonial obligations and expectations. The latter are breached by postnuptial as well as antenuptial renunciation. The New York courts have taken a similar view, holding that occurrence of a marriage ceremony does not affect operation of the statutory bar. (*Bressler* v. *Bressler*, 133 N.Y.S.2d 38, 42; *Grunberg* v. *Grunberg*, 199 Misc. 249 [99 N.Y.S.2d 771].)

From a teleological view the matter is somewhat more doubtful. Section 43.5 is designed to eliminate a class of lawsuits which were frequently used for extortion, which promoted fraud and perjury and encouraged marriages motivated by fear of a lawsuit instead of love. (See *Ikuta* v. *Ikuta*, 97 Cal.App.2d 787, 789 [218 P.2d 854]; 13 So.Cal. L.Rev. 37; 18 Chicago-Kent L.Rev. 198, 202; 158 A.L.R. 617-618.) These purposes are less apparent where the defendant has not jilted his bride at the church door but has led her to and from the altar. In the latter case the existence of mar-

riage vows is a conceded fact, not resting on perjury or the uncorroborated testimony of a vengeful plaintiff.

The policy objective of section 43.5, subdivision (d), becomes more evident in the light of the position taken by the 1959 Legislature, when it enacted section 43.4. The latter, it will be recalled, was adopted following the decision in *Langley* v. *Schumacker, supra*, which was featured by a four to three division among the members of the Supreme Court. In that case the parties in fact had gone through a marriage ceremony. From the standpoint of the majority holding (that the statute did not bar a fraud action), the marriage ceremony was unimportant and received no comment. Three dissenting members, speaking through Justice Spence, took the position that fraud actions were within the statutory bar, which applied whether or not the parties had undergone the marriage ritual. With these opposing positions fully revealed, the 1959 Legislature adopted section 43.4, which was drafted to embrace a "fraudulent promise to marry or to cohabit after marriage." Thus the Legislature effectually codified the minority position in *Langley* v. *Schumacker*, not only barring actions sounding in fraud but also demonstrating a purpose to embrace postnuptial breach. This 1959 legislative expression, while not binding, is instrumental in ascertaining the scope of the earlier statute. (*California Emp. Stab. Com.* v. *Payne*, 31 Cal.2d 210, 213-214 [187 P.2d 702].)

We consider next the impact of the plea of an express promise of support and the claim of special monetary loss.

The marriage institution comprehends an array of interrelated commitments and expectations. These commitments include the usual incidents of matrimonial existence such as mutual affection, companionship, sexual relations and the traditional distribution of domestic activities. The notion of financial support by the male is implicit in marital status. Even in this era of working wives the husband has ultimate economic responsibility. In outlawing breach of promise actions, section 43.5, subdivision (d), aims at lawsuits in which one party or the other seeks financial compensation for loss of this group of expectations and commitments.

From this bundle of expectations and commitments Count I of the complaint plucks the single commitment of economic support, in this case alleged to be an express oral promise. Its isolation from the bundle gives it no added sanctity, no added enforceability. In this case, says plaintiff, the defendant made and broke an express oral promise, and this breach—

not the breach of a promise of marriage—is the gravamen of the action. ▮▮▮ A husband's promise of support is an implicit term of the marriage relationship. His traditional obligation to support his wife is imposed by law. (Civ. Code, §§ 174, 242; *Continental Casualty Co.* v. *Pillsbury,* 181 Cal. 389 [184 P. 658, 8 A.L.R. 1110]; *Garlock* v. *Garlock,* 279 N.Y. 337 [18 N.E.2d 521, 120 A.L.R. 1331]; see Note 15 So.Cal.L.Rev. 117; 1 The Cal. Family Lawyer (Cont. Ed. Bar, 1961) p. 160.) The implicit obligation of support is just as real, just as binding, as an express avowal. The measure of the man's legal responsibilities receives no enlargement when he superimposes an articulate commitment on the identical implied obligation. The law calls on him just as loudly to fulfill one as the other. His breach of the express promise subjects him to as much—and as little—responsibility as his violation of the implied promise.

▮▮▮ Breach of promise actions generally aim at financial vindication of the entire group of marital expectations and commitments. (See 11 C.J.S., Breach of Marriage Promise, § 40, pp. 808-810; 12 Am.Jur.2d, Breach of Promise, § 26, pp. 726-727.) That one plaintiff seeks compensation for outraged affection or loss of companionship, while another expresses loss of expected support, is not a pivotal factor.[2] Loss of support may arouse more sympathy than balm for outrage and humiliation, but the statute no more allows the former variety of damage than the latter. Thus a plaintiff may not, by selecting frustrated economic expectations as the sole item of damage, escape the bar of the statute.

The cancellation of plaintiff's government payments represents a substantial variation on the damage theme usually sounded in breach of promise actions. As a result of defendant's breach, plaintiff has suffered not only the loss of future support from defendant, but the loss of assured income from independent sources. On the face of the matter defendant's wrong has caused genuine hardship of a special kind which is quite distinct from her loss of the standard group of marital advantages. It has been noted that statutes outlawing such suits undoubtedly deny relief in many cases of serious and

---

[2] An apparent but not genuine exception is the action for restoration of property acquired through a fraudulent marriage promise. (*Mack* v. *White,* 97 Cal.App.2d 497 [218 P.2d 76]; *Norman* v. *Burks,* 93 Cal.App. 2d 687 [209 P.2d 815].) As noted by Justice Spence in his *Langley* v. *Schumacker* dissent (46 Cal.2d at p. 605), such cases may be justified on the basis of preventing unjust enrichment. (See also Civ. Code, § 1590.)

genuine wrong. (*Morris* v. *MacNab*, 25 N.J. 271 [135 A.2d 657, 72 A.L.R.2d 948]; 12 Am.Jur.2d, Breach of Promise, § 19, p. 719; Prosser on Torts (2d ed.) p. 697.) This peculiar kind of loss, coupled with the occurrence of a marriage ceremony which precludes the possibility of a trumped-up promise, lends strong justification to the argument that this case is outside the restrictive policy of the statute.[3]

Such an argument is not completely persuasive. The statute on its face makes no distinction between one kind of damage and another. It abolishes the remedy for the wrong without express recognition of such an individualized loss, however genuine. Thus literal pursuit of literal language tends to bar recognition of plaintiff's special loss. In deference to hard cases outside the seeming reach of legislative foresight, courts occasionally elevate pursuit of statutory policy over literal obedience. This case is not that hard. Plaintiff has alternative remedies which, so far as her pleading goes, she has not pursued. She has not, as did the plaintiff in *Langley*, preceded this action by an annulment for fraud.[4] Her present suit insists on the binding character of defendant's commitments. If she extends equivalent recognition to the marriage, she may file suit for divorce or separate maintenance, seeking support payments approximating the loss asserted here. On the other hand, if a wronged woman is permitted to recover a damage judgment under these circumstances, she may then pursue cumulative legal remedies to secure additional money, vengeance or both. ■ The availability of alternative remedies to recoup her loss persuades us that her claim of special damage should not escape the bar of section 43.5, subdivision (d).

■ Count II alleges a fraudulent promise "to live with

---

[3] "Recovery in actions for breach of promise has frequently included elements for which an independent action would be recognized on ordinary principles of tort, promissory estoppel, or quasi-contract. The statute should not prevent recovery for such elements, even though the establishment of the cause of action might require evidence of a promise to marry and its breach. The danger of circumventing the statute is obvious. But courts cannot escape the burden of construing legislation as sweeping as this, so as to eliminate the evils aimed at without destroying rights not considered by the legislature, whose continued existence may be important to society and to individuals." (Feinsinger, *Legislative Attack on "Heart Balm,"* 33 Mich.L.Rev. 979, 1000, quoted in 4 U.C.L.A. L.Rev. 114, 116.)

[4] We do not, of course, predict whether an annulment would cause restoration of Veterans Administration and social security payments.

and support plaintiff as man and wife, and keep plaintiff as his wife for the rest of their joint mutual lives." In view of *Langley* v. *Schumacker,* this fraud count must be measured by section 43.4 rather than section 43.5, subdivision (d). The former abolishes suits based upon a fraudulent promise to cohabit after marriage. At this point the complaint indulges in the dancing footwork of artful pleading, meticulously avoiding the word "cohabit" and resorting to a series of equivalent terms. If a promise to cohabit excludes the gamut of promises described by plaintiff, then, in Professor Pomeroy's phrase, cohabit is nothing but "a delicate euphemism for copulation." (See 1 Armstrong, Cal. Family Law, p. 7.) ■ The accepted California concept of cohabitation is the mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent upon sexual relations. (*People* v. *McIntyre,* 213 Cal. 50, 54-55 [1 P.2d 443]; *Sharon* v. *Sharon,* 79 Cal. 633, 670 [22 P. 26, 131].) Considered as an exercise of advocacy, Count II possesses a measure of merit. ■ As an attempt to avoid the bar of section 43.4, it fails because it succeeds in alleging nothing but breach of a fraudulent promise to cohabit after marriage.

At this point too, plaintiff's loss of government payments arouses real concern. Notwithstanding the special character of the loss, the gravamen of Count II is defendant's fraudulent promise to live with and support plaintiff, that is, to cohabit after marriage. The allegation calls upon the trial court to explore the suitor's mind to determine the sincerity of his marriage proposal, a function decried by statutory policy. (*A. B.* v. *C. D.,* 36 F.Supp. 85, 87.) Defendant received no money or property. The objective of the action is damages, not restitution. (Cf. *Mack* v. *White, supra; Norman* v. *Burks, supra.*) Thus, the legal character of the injury and the character of the litigation objective bring the claim within the jaws of section 43.4. If, because of the tangible character of this loss, the court is moved to carve out an exception in deference to its own appraisal of statutory policy, other hardship cases will appear hereafter. The damage might consist of an expensive trousseau or a home sold at a loss. Such damage hardly differs from the loss of profitable employment alleged by the plaintiff in *Langley* v. *Schumacker.* ■ The enactment of section 43.4 following and with a plain view of *Langley* v. *Schumacker* demonstrates a

vigorous legislative policy which should not be sapped by refined distinctions shaped to fit hardship cases.

Count III of the complaint, after alleging the same marital promises as the preceding counts, asserts that "defendant either negligently married plaintiff or negligently left plaintiff without giving reasonable care as to the support of plaintiff. . . . " Here plaintiff grasps the seeming opportunity offered by *Langley* v. *Schumacker* of pleading in tort rather than contract. There are many instances where an injured party has the election of an action *ex contractu* or *ex delicto*. (See *Eads* v. *Marks,* 39 Cal.2d 807, 810-811 [249 P.2d 257].) There are also injuries which fall entirely into one class or the other, where the claim is purely a breach of promise and cannot be transmuted into a tort action by allegations that the promise was negligently or maliciously broken. (*Estep* v. *Budger Mfg. Co.,* 164 Cal.App.2d 119, 123-124 [330 P.2d 298] ; *Peterson* v. *Sherman,* 68 Cal.App.2d 706, 711 [157 P.2d 863] ; 1 C.J.S., Actions, § 47, p. 1103.) ▮ Election is particularly impermissible where the injection of tort language in a complaint is, as here, a transparent pleading device for circumventing a statutory barrier. (See cases cited 1 Witkin, Cal. Procedure, Actions, § 43, pp. 539-540.) The demurrer to the third count was properly sustained.

▮ Finally, plaintiff asserts that sections 43.4 and 43.5 are unconstitutional, destroying a cause of action without due process of law. The claim is made after repeated decisions to the contrary and is untenable. (*Jacks* v. *Jacks,* 140 Cal.App.2d 852 [295 P.2d 921] ; *Ikuta* v. *Ikuta, supra,* 97 Cal.App.2d 787; *Langdon* v. *Sayre,* 74 Cal.App.2d 41 [168 P.2d 57] ; see *Fearon* v. *Treanor,* 273 N.Y. 645 [8 N.E.2d 36], appeal dismissed 301 U.S. 667 [57 S.Ct. 933, 81 L.Ed. 1332], reh. denied 302 U.S. 774 [58 S.Ct. 6, 82 L.Ed. 600] ; cases collected 158 A.L.R. at 618-623; see also *Werner* v. *Southern Cal. Assoc. Newspapers,* 35 Cal.2d 121, 125-128 [216 P.2d 825, 13 A.L.R.2d 252].)

Judgment affirmed.

Schottky, J., concurred.

PIERCE, P. J.,—I dissent. In my opinion Count II states a cause of action in fraud and deceit.

Count II effectually alleges that defendant, with knowledge that plaintiff would thereby lose valuable rights in the nature of pensions, represented (promised) to her that he would live with *and support her,* a representation which he

made without any intent to perform but which she believed, relied and acted upon to her damage.

There is no question that this, at common law, would state a cause of action in deceit, and that the common law is applicable in California unless changed by statute. When, therefore, we turn to Civil Code section 43.4 to determine whether it destroys this cause of action we must do so obedient to the rule that statutes in derogation of the common law shall be strictly construed. The section includes provision that "A fraudulent promise to . . . *cohabit* after marriage does not give rise to a cause of action for damages." (Italics added.)

As the opinion of Justice Friedman points out, this section was written into the anti-heart-balm law after *Langley* v. *Schumacker* (June 1956) 46 Cal.2d 601 [297 P.2d 977], and no doubt with that opinion in mind. The facts in *Langley* were that plaintiff gave up her job upon defendant's fraudulent representation that he would marry her; and "consummate the marriage" by having "marital intercourse" and by cohabiting with plaintiff. The court in *Langley* held that Civil Code section 43.5 outlawing causes of action for breach of promise of marriage did not apply to an action for fraud.

When the Legislature in 1959 stated in response to the *Langley* decision that a fraudulent promise to cohabit after marriage was *not* actionable, there is no gainsaying that a plaintiff who bases her (or his) complaint wholly upon a fraudulent representation of "cohabitation" as the word was applied in *Langley* and as it was intended to be applied by the Legislature when it "overruled" *Langley,* states no cause of action.

But, where I part company with the majority opinion is its tenet that the cause of action stated here is based upon nothing other than a fraudulent promise of cohabitation. The opinion states that the "complaint indulges in the dancing footwork of artful pleading, meticulously avoiding the word 'cohabit' and resorting to a series of equivalent terms."

I cannot agree that the terms of this complaint *are* "equivalent." The fraudulent acts alleged here undoubtedly embrace cohabitation but they go beyond that.

Defendant, it is alleged, not only promised the plaintiff he would live with her as a husband and wife live together, which is the common meaning of "cohabit," he also promised that when she surrendered valuable property—her pension rights—she would receive in lieu thereof his labor to

support her for the rest of her life. That was the bargain struck and, in my opinion, it was no mere bargain of cohabitation as the Legislature intended to apply the word in section 43.4.

The majority opinion argues that because support by the male is the usual concomitant of marriage it is also a necessary component part of the defined term ''cohabitation.'' I do not agree. In marriage where both the husband and wife work or, where the husband does not work, can it be said that because of this they do not cohabit?

Nor, remembering the objectives in mind in the adoption of anti-heart-balm legislation, is there any conceivable reason in my opinion why the Legislature should have intended to legislate against fraudulent promises for support. Why should it so discriminate against a plaintiff, and in favor of a defendant, merely because the fraudulent representations included the added bait of unfulfilled connubial enjoyment? The ruling of the majority means that no matter how treacherous the fraud, no matter how grievous the monetary loss, there can be no recovery so long as the promisor has been astute enough to couple his promise of support with a promise to cohabit in marriage. The plaintiff who gives up a pension to become the unwed companion of the deceitful defendant can be made whole, but the plaintiff who succumbs to wiles which include marriage cannot recover—not even if plaintiff gives up pension rights equal to a fortune. The spouses may contract between themselves regarding their property and right of support. When they do so they are, because of the closeness of the relation, held to the strictest rectitude. The slightest fraud by one spouse will give the other right of redress—in all matters, that is, save when the contract includes, however casually and incidentally, the intimacy of cohabitation; or so say my colleagues here.

In my opinion the all-embracive interpretation given by the majority to the word ''cohabit'' as used in Civil Code section 43.4 is strained and impermissible. Our job is to interpret the intent of a Legislature composed of ordinary individuals, not of semanticists. We reach the kernel of their meaning when we crack the nut, not split the atom. When the Legislature barred recovery for a fraudulent promise to cohabit after marriage its meaning, as I read it, was to deprive the bride of a right to recovery when, as regards connubial bliss, realization did not measure up to anticipation, even where expectation had been whetted by artful blandishments.

It did not mean to leave her without redress when her life income had been bargained away for unrealized life support fraudulently contrived. That was the cause of action pleaded.

A petition for a rehearing was denied July 30, 1964. Pierce, P. J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied September 2, 1964. Peters, J., was of the opinion that the petition should be granted.